# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| KUHN CONSTRUCTION COMPANY, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 09-622-SLR |
| | ) | |
| OCEAN AND COASTAL | ) | |
| CONSULTANTS, INC. and | ) | |
| ROBERT F. WAITE, P.E., P.C., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

James S. Green, Sr., Esquire of Seitz, Van Ogtrop & Green, P.A., Wilmington,
Delaware. Counsel for Plaintiff. Of Counsel: Paul A. Logan, Esquire of Powell,
Trachtman, Logan, Carrle & Lombardo, P.C.

Artemio C. Aranilla, II, Esquire, and Joseph Scott Shannon, Esquire of Marshall
Dennehey Warner Coleman & Goggin, Wilmington, Delaware. Counsel for Defendant
Ocean And Coastal Consultants Inc.

"J" Jackson Shrum, Esquire of Archer & Greiner, P.C., Wilmington, Delaware. Counsel
for Defendant Robert F. Waite, P.E., P.C.

---

## MEMORANDUM OPINION

Dated: February 14, 2012
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

On August 20, 2009, Kuhn Construction Company ("plaintiff"), a Delaware business entity, filed suit against Ocean and Coastal Consultants, Inc. ("OCC"), a Connecticut corporation, and Robert F. Waite, P.E., P.C. ("Waite"), a New York entity (collectively, "defendants"). (D.I. 1) In connection with a wharf reconstruction project, plaintiff brought negligence/negligent misrepresentation claims against Waite and OCC, and fraud and misrepresentation, interference with existing contracts, and common law conspiracy claims against OCC. (Id.)

On October 5, 2009, OCC moved to dismiss this case pursuant to Federal Rules of Civil Procedure (Fed. R. Civ. P.) 12(b)(7) and 12(b)(1), claiming that plaintiff failed to join a required party – Diamond State Port Corporation ("DSPC") – and that such joinder would destroy the court's subject matter jurisdiction over this case.[1] (D.I. 6) On October 20, 2009, Waite joined OCC's motion to dismiss. (D.I. 9) By an order dated July 15, 2010, the court denied defendants' motions to dismiss. (D.I. 23) On May 18, 2011, plaintiff filed its first amended complaint in order to "amplify" and "clarify" the complaint's factual background and claims. (D.I. 52; 53; 62)

Currently before the court are two motions to dismiss under Fed. R. Civ. P. 12(b)(6): one motion has been filed by defendant Waite (D.I. 65) and the other has been filed by defendant OCC. (D.I. 66) The court has jurisdiction over this case

---

[1] To the extent that DSPC would be deemed an indispensable party, its joinder would have eliminated diversity between the parties.

pursuant to 28 U.S.C. § 1332. For the reasons that follow, the court denies Waite's motion and grant's OCC's motion.

## II. BACKGROUND

At some point prior to February 2007, DSPC retained OCC in connection with the rehabilitation of Wharf Unit 2, Berth 4 ("the project"). (D.I. 62 at ¶ 6) In anticipation of contractors bidding on the project, OCC prepared (and DSPC distributed) bid documents, which included voluminous drawings and specifications. (Id. at ¶¶ 8-10) These bid documents, which contained the words "FOR BID PURPOSES ONLY," were meant to provide prospective bidders with the information they would need to submit their bids. (Id. at ¶¶ 11-13) Plaintiff alleges that it reasonably relied on these documents when making its bid. (Id. at ¶ 15) As the lowest responsive and responsible bidder, plaintiff was eventually hired by DSPC to be the general contractor on the project; DSPC and plaintiff entered into a $10,750,000 contract for plaintiff's services. (Id. at ¶ 17) DSPC also hired OCC to assist with the construction.

Plaintiff references three activities which it claims resulted in the current dispute: (1) undisclosed changes to the bid documents after the contract award; (2) undisclosed subsurface conditions and obstructions; and (3) welding issues.

### A. Changes to the Bid Documents

On or about May 24, 2007, OCC prepared and provided plaintiff with "Issued For Construction" drawings. (Id. at ¶ 24) These drawings, which indicated that zero revisions existed, were meant to be the drawings that plaintiff relied on in the construction of the project. (Id. at ¶¶ 25-27) Because there was no indication of revisions, plaintiff requested that OCC mark any changes between the bid documents

2

and the Issued For Construction drawings. (*Id.* at ¶¶ 27-28) Plaintiff alleges that OCC purposefully obscured material changes. (*Id.* at ¶¶ 29-31) One such change related to welding requirements. According to plaintiff, the bid documents indicated that welding would only be required to connect the lower sections of the steel pipe pile; the upper connection would not require welding. (*Id.* at ¶ 22) Plaintiff claims that OCC knowingly and intentionally misrepresented that there was language in the bid documents that required welding of the upper sections of the steel pipe piles. (*Id.* at ¶¶ 32-38)

Another material change that was allegedly obscured concerned datum and elevation changes. According to plaintiff, there were numerous changes that were not disclosed, and were obscured, by OCC. (*Id.* at ¶¶ 39-53) Plaintiff also claims that these changes had a serious impact on plaintiff's ability to work since these changes meant much of the construction would be affected by the tides. (*Id.* at ¶¶ 54-63) Apparently neither OCC or DSPC would address the issue with plaintiff. (*Id.* at ¶¶ 57-58)

## B. Undisclosed Subsurface Conditions

In anticipation of preparing the bid documents, OCC undertook a review of the subsurface conditions. (*Id.* at ¶ 65) Plaintiff alleges that OCC misrepresented, in the bid documents, the effect that the subsurface conditions would have on the cost and duration of the project; plaintiff further states that it relied on these misrepresentations in calculating its bid. (*Id.* at ¶¶ 67-72) According to plaintiff, several piles were damaged when plaintiff tried to drive them in areas designated by OCC in their drawings and the pile driving plan had to be altered. (*Id.* at ¶¶ 73; 80-82) In light of these alleged misrepresentations, plaintiff claims to have incurred additional labor and equipment

3

expenses. (*Id.* at ¶ 85) Again, plaintiff also alleges that DSPC and OCC failed to address these issues despite plaintiff's requests. (*Id.* at ¶ 89)

## C. Welding Issues

While the plaintiff-DSPC contract did not contain any specific welding requirements or a requirement that plaintiff use American Welding Society ("AWS") prequalified base metals, OCC developed a weld acceptance criteria to test plaintiff's work against. (*Id.* at ¶¶ 92-99) Waite was hired by OCC to examine, and report to OCC and DSPC, about the quality of plaintiff's welds. (*Id.* at ¶ 102) In accordance with a plan devised by OCC, Waite examined the welds on 110 of the 360 steel pile pipes and issued several reports on the quality of those welds. (*Id.* at 103-04) In an August 15, 2008 report to OCC, Waite concluded that 27 of the 110 welds were problematic. Specifically, the report states that, "[o]f the 110 top welds inspected, 8 had fully dislodged backrings, 12 had mostly dislodged backrings, 7 had partly dislodged backrings and 11 other exhibited a notable flaw. . . . The dislodgment rate should have been 0% but it was 25% (27 of 110). This indicates a severe problem with the weld quality in the top welds." (*Id.* at ¶¶ 105-07; *see also id.* at ex. E) The report ultimately concludes that there is a "more than adequate justification for the rejection of all the top and extension welds due to gross non-conformance to the contract and ANS/AWS D1.1:2006, Structural Welding Code . . . requirements. Although the welds are rejectable, engineering judgment may be exercised based on anticipated service loading." (*Id.*)

## III. STANDARD OF REVIEW

4

In reviewing a motion filed under Fed. R. Civ. P. 12(b)(6), the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). A court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3rd Cir. 1994). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (interpreting Fed.R.Civ.P. 8(a)) (internal quotations omitted). A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 545 (alteration in original) (citation omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.* Furthermore, "[w]hen there are well-ple[d] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 566 U.S. 622, 129 S.Ct. 1937, 1950 (2009). Such a determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id.*

## IV. DISCUSSION

### A. Waite's Motion

5

As discussed, the only claim made against Waite in plaintiff's amended complaint is one of negligent misrepresentation. The parties agree that, in order to prove negligent misrepresentation under Delaware law, a plaintiff must show: (1) the existence of a pecuniary duty to provide accurate information; (2) the supplying of false information; (3) that the defendant failed to exercise reasonable care in obtaining or communicating the information; and (4) that the plaintiff suffered a pecuniary loss caused by reliance upon the false information. *See Lincoln Nat. Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 564, 564 (D. Del. 2010) (citing *Grunstein v. Silva,* Civ. No. 3932-VCN, 2009 WL 4698541, at \*14 (Del. Ch. Dec. 8, 2009)); *Gallagher v. E.I. DuPont De Nemours and Co.*, Civ. No. 06C-12-188, 2010 WL 1854131, at \*5 (Del. Super. Apr. 30, 2010) (citing *Lundeen v. PricewaterhouseCoopers, LLC*, Civ. No. 04C-03-200, 2006 WL 2559855, at \*6 (Del. Super. Aug. 31, 2006)). A pecuniary duty is not dependent on contractual privity; rather, it arises when the parties are in a business relationship, from which they expect pecuniary benefits. *Outdoor Technologies, Inc. v. Allfirst Fin., Inc.*, Civ. No. 99C-09-151, 2001 WL 541472, at \*5 (Del. Super. Apr. 12, 2001).

The crux of Waite's motion to dismiss is that plaintiff has failed to properly plead element two. Waite argues that the complaint does not set forth any false statements, only statements based upon Waite's professional judgment. (D.I. 65 at 9-10; D.I. 74 at 5)

Plaintiff responds to Waite's motion with two arguments. First, plaintiff points the court to Fed. R. Civ. P. 12(g)(2), which provides: "Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its

6

earlier motion." On the basis of this rule, plaintiff argues that it was procedurally improper to file a motion under 12(b)(6) since Waite had already filed a motion under 12(b)(7). (D.I. 72 at 4-5) What plaintiff fails to recognize is that Rule 12(h)(2) specifically permits plaintiff to file this 12(b)(6) motion; filing a motion under 12(b)(7) does not prohibit a party from filing a subsequent motion under 12(b)(6). The advisory committee notes emphasize this point: "[W]hile [certain 12(b) motions] are subject to waiver . . . the more substantial defense[] of failure to state a claim upon which relief can be granted . . . [is] expressly preserved against waiver by . . . subdivision (h)(2)." Fed. R. Civ. P. 12, advisory committee notes to the 1966 Amendment, subdivision h.

Second, plaintiff points the court to its July 15, 2010 memorandum opinion (D.I. 22) and argues that the court has already concluded that plaintiff set forth sufficient allegations in support of a negligent misrepresentation cause of action against Waite. (D.I. 72 at 6) While the court did, in that opinion, suggest that Waite made a material misrepresentation, the court emphasizes that it was tasked with resolving a separate issue, namely, whether DSPC was a required party; sufficiency was not the court's focus, nor the focus of the parties' briefs. The court only reviewed the elements of the claim in order to get to its ultimate conclusion (i.e., that DSPC was not a required party). After a review of Waite's 12(b)(6) argument and examination of the amended complaint, however, the court still finds that plaintiff has sufficiently alleged the existence of a false representation by Waite. Plaintiff specifically alleges that the "engineering conclusions and recommendations by [Waite] were not supported by industry standards and were erroneous." (D.I. 62 at ¶ 133) Thus, contrary to Waite's assertions, plaintiff has argued that "Waite's conclusions were erroneous as material facts susceptible to actual

7

knowledge." (D.I. 65 at 9) Plaintiff did this by alleging that Waite's conclusions were inaccurate according to verifiable engineering standards. (D.I. 62 at ¶ 110; 133)

The court also notes that Waite has not cited any Delaware case law for the proposition that a negligent misrepresentation claim must be dismissed where a complaint provides only allegations of professional opinions or conclusions.[2] *Lundeen v. Pricewaterhousecoopers, LLC* – the Delaware-based negligent misrepresentation case upon which Waite primarily relies – was resolved on summary judgment, not a motion to dismiss. *Lundeen*, 2006 WL 2559855, at \*6. In *Lundeen*, the court found that the plaintiffs, at summary judgment, had not produced evidence that defendant misstated financial information, i.e., plaintiffs produced no evidence that defendant violated generally accepted accounting principles ("GAAP"). *Id.* at \*6. While Waite would have the court believe that this case supports a Fed. R. Civ. P. 12(b)(6) dismissal, the citation appears to bolster plaintiff's case. Like the plaintiffs in *Lundeen*, plaintiff at bar alleges that professional standards were disregarded. Waite's motion is denied.[3]

## B. OCC's Motion

As discussed, plaintiff's amended complaint sets forth four causes of action against OCC: 1) negligent misrepresentation; 2) fraud and misrepresentation; 3)

---

[2] Waite's citation to Massachusetts law is neither binding nor persuasive. (D.I. 65 at 8-9)

[3] A trial date is set for April 16, 2012 and a pre-trial conference is scheduled for March 29, 2012. In light of the court's decision, the trial date will be re-scheduled, after consultation with the parties, in order to accommodate discovery and a summary judgment motion practice.

8

interference with existing contracts; and 4) common law conspiracy. OCC argues that each claim should be dismissed under Fed. R. Civ. P. 12(b)(6).[4]

## 1. Negligent misrepresentation

OCC agues that plaintiff's claim for negligent misrepresentation is barred by the economic loss doctrine. (D.I. 66 at 10-13) The economic loss doctrine is a judicially created doctrine that allows a party to recover in tort only if losses are accompanied by bodily harm or property damage; in other words, the doctrine prevents plaintiffs from recovering in tort for losses suffered that are solely economic in nature. *Delaware Art Museum v. Ann Beha Architects, Inc.*, Civ. No. 06-481, 2007 WL 2601472, at *2 (D. Del. Sept. 11, 2007) (citing, inter alia, *Danforth v. Acorn Structures, Inc.*, 608 A.2d 1194, 1195 (Del. 1992)) (quotations omitted); *Millsboro Fire Co. v. Constr. Mgmt. Servs., Inc.*, No. 05C-06-137, 2006 WL 1867705, at *2 (Del. Super. Jun 7, 2006). Plaintiff acknowledges that only economic losses have occurred. Plaintiff, however, argues that recovery is still possible under a cognizable exception to the economic loss doctrine. (D.I. 70 at 2; 9-13)

Delaware has recognized a narrow exception to the economic loss doctrine with the adoption of § 552 of the Restatement (Second) of Torts, which provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

---

[4] Plaintiff argues, as it did in its defense of Waite's motion, that Fed. R. Civ. P. 12(g)(2) bars OCC from filing this 12(b)(6) motion. (D.I. 70 at 6-7) For the reasons discussed in section IV.A., *supra*, the court finds this argument to be without merit.

*Id.*[5] In order to maintain a cause of action under § 552, a plaintiff must prove: 1) defendant supplied the information to plaintiff for use in business transactions with third parties; and 2) defendant is in the business of supplying information. *Delaware Art Museum*, 2007 WL 2601472, at *2. There is no dispute between the parties with respect to element one; instead, the parties disagree on whether plaintiff is "in the business of supplying information." (D.I. 66 at 11-13; D.I. 70 at 9-13)

"To determine whether a defendant is in the business of supplying information, a court must conduct a case-specific inquiry, looking to the nature of the information and its relationship to the kind of business conducted." *RLI Ins. Co. v. Indian River School Dist.*, 556 F. Supp. 2d 356, 361-62 (D. Del. 2008) (citing *Christiana Marine Serv. Corp. v. Texaco Fuel and Marine Mktg.*, No. Civ.A.98C-02-217WCC, 2002 WL 1335360, at *6 (Del. Super. June 13, 2002)). Delaware courts have found a defendant in the business of supplying information and, thus, potentially liable under § 552, when "information is the end and aim product of a defendant's work." *Delaware Art Museum*, 2007 WL 2601472, at *2 (internal quotations omitted); *see also Millsboro Fire Co.*, 2006 WL 1867705, at *2. When, however, the "information supplied is merely ancillary to the sale of a product or service . . . defendant will not be found to be in the business of supplying information." *RLI Ins. Co.*, 556 F. Supp. 2d at 362 (quoting *Christiana Marine*, 2002 WL 1335360, at * 7 (quoting *Tolan and Son, Inc. v. KLLM Architects, Inc.*, 719 N.E. 2d 288, 296 (Ill. App. 1999))). "[T]he provision of plans and design drawings used to construct

---

[5] Delaware employs a "narrow application and strict construction of § 552." *Christiana Marine Serv. Corp. v. Texaco Fuel and Marine Mktg.*, No. Civ.A.98C-02-217WCC, 2002 WL 1335360, at *6 (Del. Super. June 13, 2002)

10

[a] project, do not constitute the business of supplying information," because that type of information is "more aptly categorized as information incidentally supplied . . . as part of [a] construction [project]," (i.e., the sale of a finished product). *Millsboro*, 2006 WL 1867705, at *3; *see also Delaware Art Museum*, 2007 WL 2601472, at *3 (citing *Millsboro*). Put differently, defendants who produce plans and drawings for a construction project are not in the business of supplying information since the information they provide is ancillary to the sale of their finished product.

With specific reference to architecture and engineering defendants, the court in *Tolan and Son, Inc. v. KLLM Architects, Inc.* explained the issue this way: "[B]ecause the focus of an engineer's or architect's work is usually tangible - a building, a structure, or a product - it is not in the business of providing information. [A]ny information provided is merely incidental to the finished product." 719 N.E. 2d at 291. In other words, "in the usual course of events, architects and engineers provide information, plans, and specifications that are incorporated into a tangible product, building, or structure" and, consequently, "the negligent misrepresentation exception to the economic loss doctrine does not generally apply."[6] *Id.*

While "[d]ecisions as to whether a defendant falls within the exception to the economic loss doctrine are typically made at summary judgment in Delaware," the issue can be resolved on a motion to dismiss when the complaint unambiguously places a defendant outside of the exception. *Delaware Art Museum*, 2007 WL 2601472, at *4. In

---

[6] While *Tolan and Son* is an Illinois case, Delaware courts have looked to Illinois law, and specifically *Tolan and Son*, in an effort to explain and apply the exception at issue. *See e.g.*, *Christiana Marine*, 2002 WL 1335360, at *6-7 (quoting *Tolan and Son*).

the present case, it is clear from the amended complaint that OCC was tasked with providing plans and drawings for the rehabilitation and reconstruction of Wharf 2, Berth 4. (D.I. 62 at ¶¶ 6-12; 24-26) As such, the "end and aim" was not the provision of information, but "is more aptly categorized" as information incidentally provided as a part of a wharf reconstruction (i.e., a finished product). See Millsboro, 2006 WL 1867705, at *3; c.f., Tolan and Son, 719 N.E. 2d at 291; 295-97 (citing Tribune Co. v. Geraghty & Miller, Inc., No. 97 C 1889, 1997 WL 438836, (N.D. Ill. July 25, 1997) (noting that where an architect or engineer's report was not meant to result in a tangible structure, the architect or engineer may be considered to be in the business of supplying information)).[7]

Plaintiff, in support of its position, cites the Delaware Superior Court case Guardian Construction. Co. v. Tetra Tech Richardson, Inc., 583 A.2d 1378 (Del. Super. 1990). In Guardian, the Delaware Department of Natural Resources and Environmental

---

[7] Aside from preparing bid plans and "Issued for Construction" drawings, a review of plaintiff's amended complaint reveals that OCC was also tasked with overseeing and monitoring the progress of the construction project and, more specifically, tasked with raising and addressing construction-related concerns with plaintiff. (See e.g., D.I. 62 at ¶ 32 (OCC held "Progress Meetings" in which it raised construction-related concerns and told plaintiff how to address those concerns); id. at ¶ 73 (noting that, during the project, OCC directed plaintiff to alter its plans and proceed in a different fashion); id. at ¶ 88 (noting that plaintiff, during the course of the construction project, would seek answers to construction-related questions from OCC); id. at ¶¶ 101-04 (noting that OCC coordinated an inspection of plaintiff's work product)). Thus, while the preparation of these plans and drawings is, alone, sufficient to place OCC outside of the exception, OCC's other activities are further evidence that OCC was not in the business of supplying information. While plaintiff would have the court view the preparation of the bid documents in a vacuum, separate and apart from any other work OCC did on this project (D.I. 70 at 11-12), the court declines to do so. In determining whether a defendant is in the business of supplying information, the court must consider "the nature of the information and its relationship to the kind of business conducted." RLI Ins., 556 F. Supp. 2d at 361-62.

12

Control ("DNREC") initiated a construction project designed to make improvements to the Augustine Beach breakwater structure. *Id.* at 1380. DNREC hired Tetra Tech Richardson ("TTR") as the "design engineer" for the project. *Id.* TTR was tasked with "prepar[ing] contract documents and specifications for the project." *Id.* In reliance upon the "plans and specifications," as well as "certain technical information," provided by TTR, Guardian Construction Company ("Guardian"), among others, submitted a bid to DNREC. *Id.* Guardian was eventually hired by DNREC to be the general contractor on the project. *Id.* After commencing work, Guardian discovered that TTR's plans and specifications were based upon faulty calculations. *Id.* As a result of these miscalculations, Guardian claimed that it was unable to perform its work at the cost set forth in its bid and, therefore, incurred additional labor and equipment costs. *Id.* at 1381. Guardian sued TTR for negligent misrepresentation on the basis of its supplying bid documents with miscalculations. *Id.* The *Guardian* court concluded that Guardian could sue, under § 552, for TTR's conveyance of faulty information in the bid documents. *Id.* at 1386.

While the facts in *Guardian* are similar to those in the case at bar, the court nevertheless declines to adopt the holding in that case. First, the court notes that OCC, unlike TTR, remained involved past the bid phase of the construction project. Second, the court emphasizes that *Guardian* is a non-precedential Superior Court opinion. Third, in the twenty-plus years since *Guardian* adopted the § 552 exception to the economic loss doctrine, Delaware courts have clarified, refined and narrowed the scope of the exception. While *Guardian* may be analogous in some ways, the current weight of authority suggests that the exception does not apply; the provision of plans and

13

drawings in connection with a construction project is considered to be information that is incidental to the sale of a finished, tangible product. *See e.g. Christiana Marine*, 2002 WL 1335360, at *7 (adopting *Tolan*); *Millsboro*, 2006 WL 1867705, at *3.

## 2. Fraud and misrepresentation

OCC argues that plaintiff's fraud and misrepresentation claim should be dismissed for two reasons. First, OCC claims that the economic loss doctrine bars recovery. (D.I. 66 at 10-13) Second, OCC argues that plaintiff has not met the heightened pleading standard set forth in Fed. R. Civ. P. 9(b). (D.I. 66 at 16-20)

### a. Economic loss doctrine

As discussed, the economic loss doctrine generally prohibits recovery in tort for solely economic harm. Fraudulent inducement is, however, a recognized exception to this doctrine. *See Brasby v. Morris*, No. C.A. 05C-10-022-FS, 2007 WL 949485, at *7 (Del. Super. Mar. 29, 2007). So long as the fraud claim relates to the inducement of the contractual relationship, and not performance under the contract, an exception exists. *Id.* ("Claims of fraud, even where purely economic losses are asserted, are not always prohibited by the economic loss rule. . . . Allegations of fraud that go directly to the inducement of the contract, rather than its performance, would present a viable claim."). While OCC acknowledges that fraudulent inducement can be a valid exception,[8] it argues that the only fraud alleged in the amended complaint is fraud in the performance of the contract. (D.I. 75 at 7) Thus, to the extent that plaintiff has sufficiently alleged a fraudulent inducement claim, the claim could move forward; however, for the reasons

---

[8] Both parties cite to *Brasby v. Morris* and agree that its holding is accurate and applicable. (D.I. 70 at 14; D.I. 75 at 6-7)

14

discussed more fully below, the court finds that any allegations of fraudulent inducement that may have been made, cannot survive this motion to dismiss.

### b. Heightened pleading standard

Allegations of fraud are subject to a heightened pleading standard. Under Fed. R. Civ. P. 9(b), a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." This heightened pleading standard was meant to "place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of . . . fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3rd Cir. 1984). "Plaintiffs may satisfy this requirement by pleading the date, place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into their allegations of fraud. . . . Plaintiffs also must allege who made [the] misrepresentation to whom and the general content of the misrepresentation." *Lum v. Bank of America*, 361 F.3d 217, 224 (3rd Cir. 2004). "The use of 'boiler plate and conclusory allegations will not suffice.'" *Kuhn Const. Co. v. Diamond State Port Corp.*, Civ. No. 10-637, 2011 WL 1576691, at *9 (D. Del. Apr. 26, 2011) (citing *In re Burlington Coat Factory*, 114 F.3d 1410, 1418 (3rd Cir. 1997)).

Another element that is essential to a fraud pleading is scienter. *Kuhn Const.*, 2011 WL 1576691, at *. In an attempt to emphasize the necessity of scienter and the fact that plaintiff's complaint does not contain it, OCC directs the court to *Kuhn Construction Co. v. Diamond State Port Corp.*, a companion case to the one presently before the court. In *Kuhn Construction*, the court held:

15

> Scienter is an essential element in pleading fraud. Plaintiff has failed to allege that defendant knew or believed that the information that was provided was either false or purposefully misleading. Further, plaintiff has not identified the content of the alleged misrepresentations or how the claimed representations were false. The failure to allege circumstances indicating conscious or reckless behavior by the defendant, or facts showing a motive or clear opportunity for committing fraud cause plaintiff's claim to fail as a matter of law.

*Id.* On the basis of this holding, OCC argues plaintiff's complaint should also be dismissed. (D.I. 66 at 18-20)

As discussed, in light of the economic loss doctrine, plaintiff could only proceed on a fraud claim to the extent that the claim alleged that fraud induced the signing of the contract. In this regard, plaintiff has alleged that OCC made false representations in the bid documents in order to induce plaintiff to sign the contract with DSPC. (D.I. 62 at 138)[9] Plaintiff, however, has not alleged or explained in its brief what motivation OCC would have for making these knowingly false representations. In its reply brief, plaintiff only argues that the court already found, in its July 15, 2010 memorandum opinion, that plaintiff had sufficiently pled a fraud cause of action. As discussed above, the court was not tasked at that juncture with addressing the sufficiency of the complaint; while the court did review and comment on the elements of a fraud claim, it only did so in order to

---

[9] Specifically, plaintiff alleges that OCC made the following "false and fraudulent misrepresentations" in the bid documents: 1) there was no welding requirement for the upper sections of the piles; 2) plaintiff could perform work "in the dry," without regard for tidal issues; 3) the subsurface conditions would not detrimentally affect pile driving and overall construction; and 4) OCC would effectively communicate and work with plaintiff to resolve all issues. (D.I. 62 at ¶ 138) The other alleged fraud concerns OCC misrepresenting the existence of, and obscuring changes made between the issuance of the bid documents and the Issued For Construction drawings (with specific respect to welding issues and datum/elevation changes). (*Id.* at ¶¶ 139-40) These alleged misrepresentations occurred after plaintiff entered into the contract.

16

address the 12(b)(7) issue at hand. Having now had the benefit of the parties' 12(b)(6) briefs, the court concludes that plaintiff's claim of fraud is implausible. There is no allegation explaining (and the court cannot conceive of a reason why) OCC would make knowingly false statements.[10]

### 3. Interference with existing contracts

"A claim for tortious interference with contractual relations requires proof of five elements under Delaware law: 1) a contract, 2) about which the defendant knew, 3) an intentional act that is a significant factor in causing the breach of contract, 4) without justification, and 5) which causes injury." *Johnson v. Geico Cas. Co.*, 673 F. Supp. 2d 244, 250 (D. Del. 2009) (citing *AeroGlobal Capital Mgmt. v. Cirrus Indus.*, 871 A.2d 428, 437, n.7 (Del. 2005)). A claim for tortious interference, however, may not be maintained by a defendant that is a party to the contract; in other words, "a party to a contract cannot tortiously interfere with that very same contract." *Grunstein*, 2009 WL 4698541, at *16. By extension, agents of a contracting party are also unable to tortiously interfere. *Id*; *Tenneco Automotive, Inc. v. El Paso Corp.*, No. Civ. A 1880-NC, 2007 WL 92621, at *6 (Del. Ch. Jan. 8, 2007).

OCC argues that it was an agent of DSPC and, therefore, cannot have tortiously interfered. (D.I. 66 at 13-15) As discussed in the court's July 15, 2010 memorandum

---

[10] As argued by OCC: "[i]n order to accept [plaintiff's] fraud claims as plausible, the Court would have to accept that OCC had some interest in seeing its design fail, to prolong the construction, or to harm [plaintiff]. Although not alleged by [plaintiff], such allegation, if made, would be preposterous and implausible as they would suggest that OCC was interested in either sabotaging the entire project, along with its own reputation; or, in performing additional design work gratis since DSPC was under no contractual obligation . . . to pay OCC to correct its mistakes." (D.I. 66 at 19)

opinion, "an agency relationship is determinable only after appropriate discovery and, thus, is not appropriate for a motion to dismiss." (D.I. 22 at 20) (citing, inter alia, *Jurimex Kommerz Transit G.M.B.H. v. Case.* Corp., 65 Fed. App'x 803, 808 (3d Cir. 2003) (citing *Canavan v. Beneficial Fin. Corp.*, 553 F.3d 860, 865 (3d Cir. 1977)) and *Fisher v. Townsends, Inc.*, 695 A.2d 53, 59 (Del. 1997) (explaining that the determination of whether a person is a servant or an independent contractor is ordinarily made by the fact-finder)).

Alternatively, OCC argues that, even if it is not deemed an agent (or such a determination cannot be made on this motion to dismiss), under Delaware law, an "interference privilege" exists for non-parties to the contract when the non-party shares a commonality of economic interests with one of the contracting parties and acts in furtherance of the parties' shared business interests. (D.I. 66 at 15) (citing *Grunstein*, 2009 WL 4698541, at *16). To overcome this "affiliated" party privilege, a plaintiff must affirmatively "plead that the non-party 'was not pursuing in good faith the legitimate profit seeking activities of the affiliated enterprises,' or 'was motivated by some malicious or other bad faith purpose to injure the plaintiff.'" *Grunstein*, 2009 WL 4698541, at *16 (citing *Shearin v. E.F. Hutton Group, Inc.*, 652 A.2d 578, 591 (Del. Ch.1994)). OCC correctly points out that plaintiff has not made such an allegation.

Plaintiff responds by arguing that the interference privilege applies only to "affiliated enterprises" such as parent and subsidiary companies, and would not apply to OCC. (D.I. 70 at 16) Contrary to plaintiff's assertion, the interference privilege applies

to independent contractors.[11] *Young v. West Coast Indus. Relations Ass'n, Inc.*, 763 F. Supp. 64, 77-78 (D. Del. 1991) (applying Delaware law, although acknowledging that none exists directly on point). As the *Young* court explained, the "guiding principles" behind granting corporate officers or agents a privilege against a claim of tortious interference are also applicable to an independent contractor: "If the independent contractor's intent is to benefit the principal, then the alleged tortious conduct would fall within the conditional justification afforded the principal. If[,] on the other hand, the independent contractor counsels breach based on his own personal enmities or to further his own economic advantage at the expense of the other, then protection should be lacking." *Id.* (citations and quotations omitted). Accordingly, plaintiff was required to plead that OCC was acting against the best interests of DSPC or was motivated by some malicious or bad faith purpose to injure plaintiff. Its failure to do so compels the court to grant OCC's motion to dismiss.

## 4. Common law conspiracy

Under Delaware law, a civil conspiracy is not an independent cause of action; rather, it must be predicated on an underlying wrong. *Ramunno v. Cawley*, 705 A.2d 1029, 1039 (Del. 1998). Thus, if a plaintiff fails to adequately allege the elements of the underlying claim, the conspiracy claim must be dismissed. *Kuroda v. SPJS Holdings,*

---

[11] As discussed, the precise nature of the DSPC-OCC relationship is not properly determined on a motion to dismiss. While OCC makes a strong argument, based upon the contracts incorporated by reference into the complaint, that it was DSPC's agent, the court declines to decide the relationship at this stage of the proceedings. Nevertheless, the court notes that, if OCC is not deemed DSPC's agent, it will be considered an independent contractor as there is no dispute that DSPC hired OCC to act on its behalf.

19

*L.L.C.*, 971 A.2d 872, 892 (Del. Ch. 2009). Because the court has concluded that plaintiff's underlying tort claims cannot move forward, plaintiff's claim for conspiracy must also be dismissed for failure to state a claim.

## V. CONCLUSION

For the reasons discussed above, the court denies defendant Waite's motion to dismiss but grants defendant OCC's motion. An appropriate order shall issue.